**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NIKKITA BROWN, <br><br> Plaintiff, <br><br> vs. <br><br> CITY OF CHICAGO, a Municipal Corporation; and BRUCE R. DYKER, star no. 19236, Individually and as an Employee of the CITY OF CHICAGO, <br><br> Defendants. | Case No. 1:22-cv-03169 <br><br> **Plaintiff Demands Trial by Jury** |

**COMPLAINT AT LAW**

Now comes the plaintiff, NIKKITA BROWN, by and through her attorneys, WISE MORRISSEY, and complaining of defendants, CITY OF CHICAGO, a Municipal Corporation (hereinafter "'CITY"); and Chicago Police Department police officer BRUCE R. DYKER, star no. 19236, Individually and as an Employee of the CITY OF CHICAGO (hereinafter "OFFICER DYKER"), and each of them and in the alternative, states for her Complaint the following:

**INTRODUCTION**

1. This case arises out of the injuries sustained by plaintiff, NIKKITA BROWN at the hands of CITY Police OFFICER DYKER on August 28, 2021.

**JURISDICTION AND VENUE**

2. This action is brought pursuant to 42 U.S.C. § 1983. Jurisdiction exists pursuant to 28 U.S.C. §§ 1331 and 1343 based on 42 U.S.C. § 1983 and questions of federal constitutional law. Supplemental jurisdiction over plaintiff's state law claims is pursuant to 28 U.S.C. § 1367.

3. Venue is proper in the Northern District of Illinois in that the events and conduct complained of herein all occurred in the Northern District of Illinois.

## PARTIES

4. Plaintiff, NIKKITA BROWN, is an African-American female and at the time of the incident resided in an apartment building located at or near the 2000 block of North Clark Street, Chicago, Illinois.

5. CITY OF CHICAGO is a municipal corporation organized under the laws of the state of Illinois.

6. At all times relevant herein, CITY, a municipal corporation, maintained, as a division of said Municipal Corporation, a police department, commonly referred to as the Chicago Police Department ("CPD").

7. On August 28, 2021, OFFICER DYKER, who while acting within the scope of his employment with the CITY as a sworn police officer, was performing his duties in the area of 159 E. LaSalle Drive, Chicago, Illinois.

8. At all times relevant herein, OFFICER DYKER, is sued in his individual and official capacity.

9. In doing the acts alleged herein, OFFICER DYKER, acted under color of authority and under color of law.

## OFFICER DYKER'S HISTORY OF MISCONDUCT

10. OFFICER DYKER has a shocking history of misconduct against minorities during his more than twenty-year career as a CPD officer.

11. OFFICER DYKER has had at least 24 Civilian Complaints lodged against him in his capacity as an officer. The 24 complaints include allegations of aggravated assault with a deadly weapon, excessive force, false arrest and racial bias against civilians.

12. OFFICER DYKER has also been named as an individual defendant in two separate civil rights lawsuits filed on behalf of two minority victims. Both civil rights lawsuits resulted in the CITY paying the victims a monetary settlement.

13. The CITY'S Civilian Office of Police Accountability ("COPA") conducted an in-depth investigation into OFFICER DYKER'S gross misconduct in this matter. On October 28, 2021, COPA concluded their investigation into the matter and forwarded their recommendation to CPD Superintendent David Brown.

14. Upon information and belief, COPA recommended to Superintendent Brown that OFFICER DYKER be terminated from the CPD for his gross misconduct in this matter.

15. Upon information and belief, Superintendent Brown also recommended to the CITY Chicago Police Board ("CPB") that OFFICER DYKER be terminated from the CPD for his gross misconduct in this matter.

16. In response to COPA and Superintendent Brown's recommendation that OFFICER DYKER be terminated for his gross misconduct, he voluntarily resigned from the CPD instead of facing termination.

17. In June 2022, the Cook County State's Attorney's Office ("CCSAO") concluded their investigation into the matter. Upon information and belief, a Cook County Grand Jury returned a True Bill of Indictment against OFFICER DYKER. The Grand Jury indicted OFFICER DYKER with the criminal charges of Aggravated Battery and Official misconduct for his wholly unjustified assault and battery of NIKKITA BROWN on August 28, 2021.

18. OFFICER DYKER'S brazen misconduct over his twenty-year career has only resulted limited discipline until now.

19. On November 30, 2000, OFFICER DYKER was in uniform and in a marked squad vehicle. At that time, OFFICER DYKER effectuated a traffic stop of a Hispanic male. During the traffic stop, OFFICER DYKER called the Hispanic male a "spic and other racial slurs" before throwing his car keys away.

20. The Hispanic male subsequently filed a Civilian Complaint with OFFICER DYKER'S superiors and/or the CPD. The CPD conducted a wholly deficient investigation before concluding the allegations against OFFICER DYKER were "not sustained." OFFICER DYKER was not punished for his misconduct.

21. On August 22, 2002, OFFICER DYKER was in uniform when he was dispatched to a gymnasium in response to a report of an intoxicated African-American male on the premises. OFFICER DYKER confronted the African-American male and directed him to leave the premises.

22. The African-American male complied with OFFICER DYKER'S order to leave the premises. OFFICER DYKER determined the African-American male was "not moving quickly enough" and violently shoved him to the ground. The African-American male struck his head against the concrete and was rendered unconscious.

23. The African-American male subsequently filed a Civilian Complaint with OFFICER DYKER'S superiors and/or the CPD. During the investigation, OFFICER DYKER claimed the man simply "slipped and fell." The CPD conducted a wholly deficient investigation before concluding the allegations against OFFICER DYKER were "not sustained." OFFICER DYKER was not punished for his misconduct.

24. On March 22, 2004, OFFICER DYKER was in uniform when he transported an arrestee to a local hospital for emergency treatment. According to a nurse who filed a Civilian Complaint, an emergency room physician wanted to allow the arrested man's family to visit him but OFFICER DYKER refused. When the doctor insisted, OFFICER DYKER threatened to "make his life miserable if he allowed the visit."

25. The CPD conducted a wholly deficient investigation before concluding the allegations against OFFICER DYKER were "not sustained." OFFICER DYKER was not punished for his misconduct.

26. On July 23, 2004, OFFICER DYKER was off-duty in a Toys "R" Us parking lot when he began screaming at a female "What the fuck? You don't know how to park." The female's husband observed OFFICER DYKER threatening his wife and confronted him. In response, OFFICER DYKER drew and pointed his handgun at both the female and her husband.

27. The female filed a Civilian Complaint with OFFICER DYKER'S superiors and/or the CPD. The CPD conducted a wholly deficient investigation before concluding the allegations against OFFICER DYKER were "not sustained." OFFICER DYKER was not punished for his misconduct.

28. On September 13, 2007, a Hispanic female alleged that OFFICER DYKER used excessive force against her. The Hispanic female subsequently filed a Civilian Complaint with OFFICER DYKER'S superiors and/or the CPD.

29. The CPD conducted a wholly deficient investigation before concluding the allegations against OFFICER DYKER were "not sustained." OFFICER DYKER was not punished for his misconduct.

30. In 2008, OFFICER DYKER was off-duty in Tennessee when he brandished his weapon and pointed it at a female companion before threatening her with physical violence. At that time, the local Police Department officers responded to the scene and ordered OFFICER DYKER to comply with their lawful orders.

31. Upon information and belief, OFFICER DYKER refused to comply with the officers' orders and physically resisted their attempts to detain him. OFFICER DYKER was subsequently arrested and charged with felony counts of aggravated assault while in possession of a weapon.

32. On November 29, 2008, OFFICER DYKER'S misconduct and arrest were reported to the CPD Independent Police Review Authority ("IPRA"). The investigation lasted more than 6 years and concluded in March 2014. The IPRA recommended that OFFICER DYKER only receive a 20 day suspension for his misconduct.

33. On December 2, 2012, a Hispanic female alleged that OFFICER DYKER used excessive force against her. The Hispanic female subsequently filed a Civilian Complaint with OFFICER DYKER'S superiors and/or the CPD.

34. The CPD conducted a wholly deficient investigation before concluding the allegations against OFFICER DYKER were "not sustained." OFFICER DYKER was not punished for his misconduct.

35. On December 1, 2015, a Hispanic male alleged that OFFICER DYKER used excessive force against him. The Hispanic male subsequently filed a Civilian Complaint with OFFICER DYKER'S superiors and/or the CPD.

36. The CPD conducted a wholly deficient investigation before concluding the allegations against OFFICER DYKER were "not sustained." OFFICER DYKER was not punished for his misconduct.

37. On March 15, 2016, OFFICER DYKER was in uniform and in marked squad vehicle. At that time, OFFICER DYKER effectuated a traffic stop of a Hispanic male. OFFICER DYKER observed tools in the Hispanic male's vehicle which he used as a metal/junk collector.

38. The Hispanic male provided OFFICER DYKER with his license to work as a junk collector and explained that the tools were used for his work in that capacity. OFFICER DYKER had no articulable suspicion that the Hispanic male had any intent to use the tools unlawfully or as a weapon.

39. OFFICER DYKER placed the Hispanic male under arrest for Unlawful Use of a Weapon. The charges against the Hispanic male were eventually dismissed.

40. The Hispanic male subsequently filed a lawsuit alleging OFFICER DYKER violated his civil rights by falsely arresting him and subjecting him to malicious prosecution under case 17-CV-01956 in the United States District Court for the Northern District of Illinois Eastern Division. The civil rights lawsuit against OFFICER DYKER was dismissed pursuant to settlement on October 3, 2017.

41. The CPD conducted a wholly deficient investigation into the matter before concluding the allegations against OFFICER DYKER were "not sustained" despite the CITY's decision to settle the lawsuit. OFFICER DYKER was not punished for his misconduct.

42. On July 5, 2019, OFFICER DYKER was in uniform and in marked squad vehicle. At that time, OFFICER DYKER responded to the scene of a motor vehicle accident. OFFICER

DYKER falsely accused an African-American female of driving the vehicle involved in the accident.

43. The African-American female informed OFFICER DYKER that she was the passenger and not the driver of the vehicle. The actual driver of the vehicle confirmed the same on the scene.

44. OFFICER DYKER used excessive force against the African-American female while placing her under arrest for the entirely baseless criminal charges of reckless driving and leaving the scene of the accident. The charges against the African-American female were eventually dismissed.

45. The African-American female subsequently filed a lawsuit alleging OFFICER DYKER claiming he violated her civil rights by falsely arresting her and using excessive force under case 21-CV-03248 in the United States District Court of Northern of Illinois District Eastern Division. The civil rights lawsuit against OFFICER DYKER was dismissed pursuant to settlement on April 28, 2022.

46. The CPD conducted a wholly deficient investigation into the matter before concluding the allegations against OFFICER DYKER were "not sustained" despite the CITY's decision to settle the lawsuit. OFFICER DYKER was not punished for his misconduct.

47. The CITY and CPD's failure to adequately investigate and discipline OFFICER DYKER'S brazen misconduct over the past 20 years confirmed that he could act with impunity. OFFICER DYKER'S sense of impunity ultimately resulted in his belief that he could attack a defenseless young African American woman who posed no threat and was complying with his orders.

**FACTUAL ALLEGATIONS**

48. On August 27, 2021 in the late evening, NIKKITA BROWN left her apartment

located on the 2200 block of North Clark Street to walk her dog along the lakeshore walking path ("pathway").

49. On August 27, 2021, OFFICER DYKER was in uniform and operating a marked squad vehicle. At approximately 11:30 p.m., video captures OFFICER DYKER parking his vehicle on or near the pathway at the LaSalle Street exit of Lakeshore Drive.

50. Over the next 55 minutes, OFFICER DYKER remained seated in his parked vehicle while more than 40 different people walked past his vehicle along the pathway. During this time period, OFFICER DYKER did not verbally confront, warn or reprimand any of the more than 40 different people walking along the pathway.

51. At approximately 12:26 a.m., NIKKITA BROWN began walking southbound on the pathway near OFFICER DYKER'S location. In response, OFFICER DYKER pulled his vehicle alongside Plaintiff.

52. Plaintiff informed OFFICER DYKER that she was in the process of exiting the pathway at the exit immediately south of their location. OFFICER DYKER became agitated and told Plaintiff to "exit the beach now!"

53. OFFICER DYKER then exited his vehicle and became more agitated before stating "why don't *you people* listen and do what you're told!"

54. Plaintiff begin backing away from OFFICER DYKER in compliance with his order to exit the beach and attempted to film the incident with her cellphone because she felt increasingly threatened by his aggressive demeanor.

55. At that time, OFFICER DYKER had given Plaintiff an order and she was in the process of actively complying with that order. At no time did Plaintiff refuse to comply with the order. At no time did Plaintiff make any verbal threats to OFFICER DYKER. At no time did

9

Plaintiff make any physical movements that could be considered threatening to OFFICER DYKER.

56. As Plaintiff continued to back away from OFFICER DYKER, she then asked OFFICER DYKER "please respect my space, it's Covid, you don't have a mask on!" OFFICER DYKER became increasingly enraged and responded "Respect your space? I'm about to put handcuffs on you. I don't need a mask."

57. As Plaintiff continued to back away from OFFICER DYKER, she pleaded with him "to move away from me, I feel threatened." OFFICER DYKER responded by screaming "Good…I'm about to put handcuffs on you if you don't keep walking."

58. At that time, Plaintiff panicked and stopped in order to call for help because she feared that OFFICER DYKER would attack her. At that point, Plaintiff had complied with OFFICER DYKER'S orders by walking more than 120 feet away from the pathway.

59. At that time, OFFICER DYKER lunged at Plaintiff before forcibly grabbing her and repeatedly attempting to violently throw her down to the pavement. Over the next 70 seconds, Plaintiff repeatedly screamed for OFFICER DYKER to "let me go" and called for "help", only to have the Defendant continue to violently batter the Plaintiff.

60. At no time prior to the battery, did Plaintiff refuse to comply with the order. At no time did Plaintiff make any verbal threats to OFFICER DYKER. At no time did Plaintiff make any physical movements that could be considered threatening to OFFICER DYKER.

### COUNT I- 42 U.S.C § 1983- Fourteenth Amendments of the United States Constitution - Excessive Force

1-60. Plaintiff NIKKITA BROWN re-alleges and incorporates the paragraphs 1-60, as paragraphs 1-60 of Count I.

61. On August 28, 2021, at approximately 12:30 a.m., OFFICER DYKER, acting under

color of law, did then and forcibly grabbed, restrained and battered NIKKITA BROWN, without reasonable cause, authority, provocation or permission.

62. At the aforementioned time and place, OFFICER DYKER used greater force than was reasonably necessary when he violently grabbed, restrained, battered and attempted to throw NIKKITA BROWN to the ground.

63. At the aforementioned time and place, OFFICER DYKER exhibited a wanton, willful and deliberate indifference to NIKKITA BROWN'S federally secured rights under the Fourteenth Amendment of the United States Constitution.

64. As a direct and proximate result of the aforementioned events NIKKITA BROWN sustained serious injuries of a personal and pecuniary nature in violation of her federally secured rights under the Fourteenth Amendment of the United States Constitution.

WHEREFORE, plaintiff, NIKKITA BROWN, prays for judgment against defendant, CITY OF CHICAGO, a Municipal Corporation; and OFFICER BRUCE DYKER, star no. 19236, Individually and as an Employee of the CITY OF CHICAGO, in an amount in excess of the jurisdictional limit of this Court.

### COUNT II - 42 U.S.C § 1983- Fourth Amendment of the United States Constitution – Unreasonable Seizure Terry Stop

1-60. Plaintiff, NIKKITA BROWN re-alleges and incorporates the paragraphs 1-60, as paragraphs 1-60 of Count II.

61. OFFICER DYKER, seized NIKKITA BROWN when he violently grabbed, restrained and battered Plaintiff.

62. OFFICER DYKER did not have reasonable suspicion that NIKKITA BROWN had committed, was committing or was about to commit a crime.

63. OFFICER DYKER'S seizure of NIKKITA BROWN, was unreasonable when

plaintiff posed no threat, had committed no crime and OFFICER DYKER had no articulable suspicion that Plaintiff was about to commit a crime.

64. As a direct and proximate result of the aforementioned events NIKKITA BROWN sustained serious injuries of a personal and pecuniary nature in violation of her federally secured rights under the Fourth Amendment of the United States Constitution.

WHEREFORE, plaintiff NIKKITA BROWN, prays for judgment against defendant CITY OF CHICAGO, a Municipal Corporation; and OFFICER BRUCE DYKER, star no. 19236, Individually and as an Employee of the CITY OF CHICAGO, in an amount in excess of the jurisdictional limit of this Court.

### COUNT III - 42 U.S.C § 1983- Fourth Amendment of the United States Constitution – False Arrest

1-60. Plaintiff, NIKKITA BROWN re-alleges and incorporates the paragraphs 1-60, as paragraphs 1-60 of Count III.

61. OFFICER DYKER, seized and arrested NIKKITA BROWN when he violently grabbed, restrained and battered Plaintiff. OFFICER DYKER'S intentional seizure of NIKKITA BROWN resulted in a termination of her freedom of movement.

62. OFFICER DYKER'S arrest of NIKKITA BROWN was unreasonable when plaintiff posed no threat, had committed no crime and OFFICER DYKER had no probable cause to believe that Plaintiff was about to commit a crime.

63. As a direct and proximate result of the aforementioned events NIKKITA BROWN sustained serious injuries of a personal and pecuniary nature in violation of her federally secured rights under the Fourth Amendment of the United States Constitution.

WHEREFORE, plaintiff NIKKITA BROWN, prays for judgment against defendant CITY OF CHICAGO, a Municipal Corporation; and OFFICER BRUCE DYKER, star no. 19236,

Individually and as an Employee of the CITY OF CHICAGO, in an amount in excess of the jurisdictional limit of this Court.

## COUNT IV – Willful and Wanton Battery

1-60. Plaintiff NIKKITA BROWN, re-alleges and incorporates the paragraphs 1-60, as paragraphs 1-60 of Count IV.

61. On August 28, 2021, at approximately 12:30 a.m., OFFICER DYKER, acting under color of law, did violently and forcibly grab, restrain and batter NIKKITA BROWN without reasonable cause, authority, provocation or permission.

62. OFFICER DYKER'S violent and forcible grabbing, restraining and battery of NIKKITA BROWN constituted an unauthorized touching of Plaintiff.

63. NIKKITA BROWN at no time consented to being touched in the manner described above.

64. NIKKITA BROWN was at no time considered an "aggressor", at no time presented a danger of harm to OFFICER DYKER and at no time threatened OFFICER DYKER.

65. OFFICER DYKER never believed NIKKITA BROWN posed a danger.

66. OFFICER DYKER'S use of force against NIKKITA BROWN was not necessary to avoid harm and in no way was reasonable under the circumstances.

67. OFFICER DYKER showed an actual or deliberate intention to cause harm or which, if not intentional, showed an utter indifference to or conscious disregard for the safety of NIKKITA BROWN when he violently grabbed, restrained and battered Plaintiff.

68. As a direct and proximate result of the aforementioned events NIKKITA BROWN sustained serious injuries of a personal and pecuniary nature in violation of her secured rights under Illinois state law.

WHEREFORE, plaintiff, NIKKITA BROWN, prays for judgment against defendant CITY OF CHICAGO, a Municipal Corporation; and OFFICER BRUCE DYKER, star no. 19236, Individually and as an Employee of the CITY OF CHICAGO, in an amount in excess of the jurisdictional limit of this Court.

## COUNT V – *Monell* Claim

1-60. Plaintiff NIKKITA BROWN re-alleges and incorporates the paragraphs 1-60, as paragraphs 1-60 of Count V.

## DOJ REPORT AGAINST THE CITY

61. In January 2017, the United States Department of Justice ("DOJ") and the United States Attorney's Office for the Northern District of Illinois released a report ("DOJ Report") after a 15 month investigation of the CITY and CPD. The DOJ Report concluded the CPD had "engaged in a pattern or practice of using force that is unjustified, disproportionate, and otherwise excessive" against minorities for decades. (Exhibit B DOJ Report pg.5).

62. The DOJ Report found "CPD's pattern or practice of unreasonable force and systemic deficiencies fall heaviest on the predominantly black and Latino" communities. In fact, statistics show that CPD used force almost ten times more often against blacks than against whites. (Exh. B pg.15).

63. The DOJ Report's findings were based on an in depth analysis of over 30,000 complaints of police misconduct during the five years preceding the investigation. The findings were also based on an analysis of CPD's investigations into misconduct, training on excessive force and a substantial number of interviews with CPD command personnel and line officers alike.

64. The DOJ Report found that fewer than 2% of those 30,000 complaints of police misconduct were "sustained" by the CPD. Even more alarming, approximately 28% of those

"sustained" findings of misconduct resulted in "no discipline imposed" and 25% led only to a "verbal reprimand." (Exh. B pg.7, 80). Even when there was a "sustained" finding leading to actual discipline of the offending officer, the median length of suspension was only three days. (*Id.* at pg.80)

65. The DOJ Report then detailed the numerous levels of review that CPD officers can use to either reduce the length of the suspension, or have the disciplinary decision reversed all together. Finally, the CPD discipline system allowed this miniscule number of officers that are actually held accountable for their actions, to satisfy their respective suspensions with vacation or furlough days. (*Id.* at pg.81). Ultimately, the officers that are suspended face absolutely no loss of income as a result of their misconduct. (*Id.* at pg.81)

66. The DOJ Report also noted that the "City, police officers, and the leadership within CPD and its police officer union acknowledge a code of silence among Chicago police officers exists, extending to lying and affirmative efforts to conceal evidence." (*Id.* at pg.8). The CITY'S policy-makers were aware of, condoned and facilitated by their inaction, a "code of silence" in the CPD. For example, on December 8, 2015, Rahm Emmanuel, Mayor of the City of Chicago, stated publicly that Chicago Police officers maintain this "code of silence."

**ILLINOIS ATTORNEY GENERAL COMPLAINT AGAINST DEFENDANT CITY**

67. On August 29, 2017, the State of Illinois, by Lisa Madigan, Attorney General of the State of Illinois, filed a Complaint against the CITY pursuant to 42 U.S.C. § 1983; the U.S. Constitution; the Illinois Constitution; the Illinois Civil Rights Act of 2003, 740 ILCS 23/5; and the Illinois Human Rights Act, 775 ILCS 5/5-102(C) ("the Complaint" or the "State's Complaint"). (Exhibit A, 17-CV-06260 Complaint). The Complaint was based in large part on the DOJ investigation and its' subsequent Report.

15

68. The Complaint alleged that CPD "maintains a policy, custom, or practice of police conduct that violates federal and state law." (Exh. A. at ¶ 31).

69. The Complaint alleged that the CPD's "policy, custom, or practice includes a repeated pattern of using excessive force without legal justification, in violation of the Fourth Amendment to the U.S. Constitution and Article I, Section 6 of the Illinois Constitution. This policy, custom, or practice has a disparate impact on the City's African American and Latino residents in violation of the Illinois Civil Rights Act of 2003 and the Illinois Human Rights Act." (*Id.* at ¶ 32).

70. The Complaint alleged this "policy, custom, or practice is further reflected in, and caused by, the City's failure to effectively train, supervise, and support law enforcement officers, and the City's failure to establish reliable programs to detect and deter officer misconduct and administer effective discipline." (*Id.* at ¶ 33).

71. The Complaint alleged the "City has acted with deliberate indifference to excessive force and discriminatory police action, as evidenced by the inadequate training, supervision, accountability, and officer wellness systems that the City has erected and maintained." (*Id.* at ¶ 71).

72. The Complaint alleged that "these systemic flaws not only result in a failure to hold CPD officers accountable for instances of excessive force and racially discriminatory policing practices, but also signal to officers that they can engage in misconduct with little to no risk that their actions will result in discipline. (*Id.* at ¶ 135).

73. The Complaint alleged that "[a]s a direct and proximate result of CPD's systemic failure to provide officers with adequate training, supervision, accountability, and mental health

support, numerous Illinois residents have been subjected to a repeated pattern of unconstitutional uses of force." (*Id.* at ¶ 72).

74. Plaintiff alleges that these customs, policies and practices, described above, were the moving force behind the violations of the Plaintiff's rights. Based upon the principles set forth in *Monell v. New York City Department of Social Services,* the City of Chicago is liable for all the harm done to Plaintiff as set forth above.

## COUNT VI – RESPONDEAT SUPERIOR

1-60. Plaintiff NIKKITA BROWN re-alleges and incorporates the Paragraphs 1-60, as Paragraphs 1-60 of Count VI.

61. In committing the acts alleged in the preceding paragraphs, defendant, OFFICER DYKER, was an agent of the City of Chicago and was acting at all times relevant within the scope of his employment and under color of law.

WHEREFORE, should the individual defendant be liable on one or more of the stated claims set forth above, plaintiff demands that, pursuant to *respondent superior*, defendant City of Chicago be found liable for any compensatory judgment Plaintiff obtains against said defendant, as well as costs awarded.

                    Respectfully submitted,

By: _____
      One of Plaintiff's Attorneys

Michael L. Gallagher
WISE MORRISSEY, LLC
ARDC#: 6281432
161 N. Clark Street, Suite 3250
Chicago, IL 60601
(312) 580-2040
mlg@wisemorrissey.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NIKKITA BROWN,

        Plaintiff,

vs.

CITY OF CHICAGO, a Municipal Corporation; and
BRUCE R. DYKER, star no. 19236, Individually and
as an Employee of the CITY OF CHICAGO,

        Defendants.

Case No. 1:22-cv-03169

## AFFIDAVIT

I, Michael L. Gallagher, state under oath:

1. I am an attorney associated with Wise Morrissey, LLC and am responsible for filing of the Complaint at Law in this matter.

2. The total of money damages sought by plaintiff does exceed $75,000.00, exclusive of interest and costs.

_____
Michael L. Gallagher

SUBSCRIBED and SWORN to before me
this _16_ day of _June_, 2022.

_____
NOTARY PUBLIC

ANGELA M SUHR
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
April 11, 2026